**DEAN v. MAYO et al.**

No. 604.

District Court, W. D. Louisiana,
Lake Charles Division.

Nov. 30, 1934.

Prowell, McBride & Ray and Leon Sarpy, all of New Orleans, La., and Vance Plauche, of Lake Charles, La., for complainants.

Lewis & Williamson, of Lake Charles, La., for respondents.

DAWKINS, District Judge.

The allegations of the original bill of complaint in this case are fully set out in the written opinion handed down on the 11th day of August, 1934. (D. C.) 8 F. Supp. 73. The court, in effect, found that the application for a preliminary injunction was premature, because the plaintiff had not complied with the provisions of the Norris-La Guardia Act (section 1 et seq. [29 USCA § 101 et seq.]) by invoking the aid of any available governmental agency for the settlement of the dispute or attempting to do so, by arbitration, but reserved the right of complainant to amend after compliance with section 8 of said act (29 USCA § 108).

Thereafter, on October 11, 1934, plaintiff filed an amended bill of complaint, in which he set forth that he had complied with section 8 by applying to the Secretary of Labor to conduct an investigation for the purpose of attempting to settle the matter; that said hearing was had, but, notwithstanding complainant made every reasonable effort to have the controversy adjusted, he was unsuccessful. He further alleged that his investment in the property amounted to $60,000, which would be destroyed, if not granted relief, whereas the injury suffered by respondents would be negligible as compared to that of complainant. He again prayed for a preliminary injunction.

The amendment was allowed, and the case was heard at Lake Charles on November 5 and 6, 1934, upon the petition and return filed by respondents, who denied substantially all of the allegations of the bill. The suit was tried in open court; the witnesses being sworn and subjected to both direct and cross-examination.

I find the facts as follows:

On July 11, 1934, the tug Corine Dean and barge Dean III, belonging to complainant, arrived at the dock and private warehouse of plaintiff in the city of Lake Charles. As a landing was about to be made, persons in large numbers were assembled on the shore and about the said warehouse, some of whom went on board the barge and informed the master that they were members of the International Longshoremen's Association and were going to unload the cargo. The number on the premises were variously estimated at from 75 to 150 persons. They attempted to discuss terms of employment with the master, but, in the absence of the owner, Dean, were informed that the master had no authority to deal with them. About 5 o'clock the next morning, the master went to the barge, and, according to his statement, there were present between 200 and 225 men. They were all around the barge and under the warehouse, which rests upon piling in the edge of the lake. The master telephoned the sheriff of the parish. The latter advised the master to go to the chief of police and mayor of the city, for the reason the premises were inside the limits of the city of Lake Charles. The city hall was then called, and the master was informed a man would be over at 7 o'clock a. m. At 8 o'clock no one had shown up, so the master called the mayor and made an appointment with him. When the master appeared at the mayor's office, the latter called in the members of the I. L. A., including the defendant Mayo, whom the master had met at the warehouse the evening before. The matter was discussed with the mayor, Mayo, and others insisting upon the employment of I. L. A. members to unload the barge, and the master stating he had no authority to deal with them in the absence of Dean. The next morning Dean arrived, and there were present, according to the estimate of the master, around 300 persons, but it was not shown that they were all members of the I. L. A. According to complainant's witnesses, their attitude was so threatening no further efforts were made to unload, and about July 14th Dean employed counsel to file this suit, which was presented to the court on July 17th. After the cause was submitted at the first hearing on July 25th and taken under advisement, Dean on the following day again attempted to unload. When work was started, several men rushed out in the water, which was shallow, to board the barge, and started climbing upon the runway from the barge to the warehouse. The captain, Stevens, appeared on the front end of the barge with a shotgun and ordered them away. They desisted from their attempts to board the barge and runway, but stood around the premises, according to complainant's witnesses, cursing and abusing the officers and employees of the complainant. Work of unloading was continued until about 5:30 p. m. The next morning, when Dean and his employees returned to resume unloading, some three or four men had stationed themselves on a partially sunken boat some fifty yards away from the barge, and armed with shotguns. The situation appeared so serious the men were instructed not to attempt further work. Dean telephoned the sheriff, who came down to the scene and was shown the men stationed on the old boat with their guns, but declined to

arrest them, and returned to his office, stating that he would see what he could do, but did not come back. Plaintiff, according to his testimony, then concluded to wait until the application for injunction had been decided.

No further effort was made until the former opinion of this court was handed down, requiring the complainant to comply with the provisions of section 8 of the Labor Injunction Act (29 USCA § 108). On the morning of September 13th, plaintiff brought his crew back from Plaquemines for the purpose of unloading the barge. He again found a large number of men, which were estimated at 175 to 200, present and around the warehouse. Dean himself began helping to bring the cargo off the barge and along the platform or runway leading to the warehouse; whereupon men in the bushes on each side of the warehouse and runway commenced throwing stones and brickbats, some of which struck and bruised Dean but did not injure him seriously. A number of these stones and brickbats were brought into court, identified and filed in evidence. Dean testified that there were something like 500 thrown, but was unable to identify any of the persons who threw them. He called the sheriff's office some two or three times, telling him what had happened, but that officer failed to go to the scene. Efforts to unload were again stopped, and on the following day complainant addressed a letter to the mayor, chief of police, and sheriff, asking them and the Chamber of Commerce for protection, and offering to pay the expenses of special officers to guard the work, which was published in the local paper on the 15th of September. Not getting any results from that appeal, on September 18th, he employed a local law firm, which wrote a letter to the sheriff, appealing for protection, citing provisions of a state statute which it was thought required him to go to the assistance of complainant, and advising that plaintiff would attempt to return to work on the following morning, September 19th. On the morning of the latter day, the sheriff went to the scene in front of the warehouse of complainant. Work was again started, and stones were thrown. Plaintiff went to where the sheriff was, and informed him of what was taking place. That officer asked Dean if he could identify the throwers of the stones. The latter then pointed out a white man and a negro, whom the sheriff arrested. As Dean returned to the warehouse and got in the road about ten feet from the front door, he was attacked by a white man and hit in the back of the head by another, whom he did not see. The sheriff then arrested one of the men who struck Dean but the other got away. The sheriff ordered the crowd to desist, and directed Dean to go in the warehouse. Men were all around the premises and in the warehouse. The sheriff made them open a passage for Dean to go into the building. A few moments later the sheriff came into the warehouse and requested complainant to quit work, stating that the "situation was getting so dangerous he was not able to cope with it and he was afraid there was going to be serious trouble if we kept on working." The sheriff requested Dean to talk to some of the men. Mayo, one of the defendants, and local head of one of the unions, came in to talk with Dean. They went to the back of the building, where Mayo did most of the talking. While this was going on, three or four other members of the union came in and sat down. The sheriff was present. A few minutes later, men swarmed into the building, and the sheriff drew his gun and ordered them back. About noon of the same day, Dean called his New Orleans counsel over the telephone and was informed that a representative of the Labor Department at Washington was there and would be in Lake Charles that night. At least two of the men arrested by the sheriff were tried, convicted, and sentenced to jail for thirty days. All of those arrested or who could be identified were found to be members of the defendants' labor organizations. In affidavits filed at the original hearing, defendants showed that they had shifts of at least sixteen white men, members of the union, present at all times, with changes twice a day and another at night, while the colored union had present a similar or possibly slightly less in number.

The sheriff did not appear as a witness to dispute any of the above statements of Dean. The chief of police did appear as a witness, and, while he testified he had visited the premises a number of times and saw no violence, admitted that he failed to provide any officers at the scene to prevent violence, notwithstanding the above conditions and the conviction of at least two men arrested by the sheriff. In reply to questions by the court as to why he had not provided such police protection, he stated that the city was without funds for this purpose.

Such of the officers and members of defendant organizations as were called as wit-

462

nesses testified that they did not see or know of the violence above mentioned. Other witnesses for the defendants testified they were around the premises several times and saw no violence, but they did not say they were there when attempts were being made to unload, which were the occasions when the violence took place, according to plaintiff's witnesses. However, there were at least two disinterested witnesses sworn, one a man residing nearby, who saw the stones thrown in the manner testified to by Dean, but who could not identify those throwing them, and the other, a former steamboat man, who appeared friendly to both sides, who described the situation as so serious he advised the complainant and his employees not to attempt to unload the barge.

Approximately a week was spent by both sides with a representative from the Department of Labor trying to settle the dispute, but nothing was accomplished, principally because Dean was not willing to run on a closed shop basis, and the defendants were not willing to agree to an open shop arrangement. Besides, the rates of pay were so wide apart there was no reasonable prospect of getting together.

The complainant's business is what is called a packet service, that is, he operates through canals and rivers of the state and from New Orleans to points in Texas, picking up freight en route, both intrastate and interstate, and carrying a crew in regular employment, some of whom are paid by the trip and others by the month and live on the tug while away. If extra help is needed, it is hired at the ports visited. All freight is handled by hand, and none of the machinery and skill used and required in loading and unloading ocean going vessels is employed; any common laborer being able to pick up boxes or packages and carry them on or off by hand or truck.

I have carefully considered the arguments on both sides in regard to the bona fides of the attempts to settle or adjust the dispute, and believe any further efforts in that direction would be useless. In view of the violence which was shown, I think the complainant is entitled to a preliminary writ of injunction to prevent further acts of this kind and to permit him to load and unload his barge. I also believe that to deny the relief will result in serious injury to complainant's business, for which there is no reasonable chance to recover of the defendants. Therefore, in compliance with the statute, I find: (1) That unlawful acts have been threatened and committed, and, unless restrained, will be continued; (2) that substantial and irreparable injury to complainant's property will follow; (3) that as to each item of relief which the court will grant in this case by the issuance of the writ will prevent greater injury to complainant than would be suffered by the defendants; (4) that complainant has no adequate remedy at law; and (5) that the local and public officers, charged with the duty to protect complainant's property, are unable or unwilling to furnish adequate protection.

I also find that the acts complained of and shown by the evidence in this case are interfering with, damaging, and restraining interstate commerce in contravention of sections 1 and 2 of the Act of July 2, 1890, 26 Stat. 209, 15 USCA §§ 1, 2, and the acts amendatory thereof.

Defendants will be permitted to keep not more than two of the members of their organizations at a point or points in the street in front of complainant's warehouse, at a distance of not less than fifty feet from the front door, so that freight may be trucked in and out of the warehouse without the probability of conflict, on the condition that they shall not engage in any threats, demonstrations, or violence toward any one working for or dealing with the complainant, but may use all means of peaceful persuasion and appeal to both officers and employees and persons dealing with complainant in support of defendant's cause. Otherwise the defendants and members of their organizations will be restrained from going in, around, or under the warehouse, the runways, tugs, and barges of the complainant or so near thereto as to interfere by threats, demonstrations, or other acts tending towards violence, as against the complainant, his employees, or persons dealing with him.

Proper decree should be presented.