DONNELLY GARMENT CO. et al. v. INTERNATIONAL LADIES' GARMENT WORKERS' UNION et al. (DONNELLY GARMENT WORKERS' UNION et al., Interveners).

No. 2924.

District Court, W. D. Missouri, W. D. July 8, 1938.

James A. Reed, William S. Hogsett, and Robert J. Ingraham, all of Kansas City, Mo., for plaintiffs.

Frank P. Walsh, Jerome Walsh, Clif Langsdale, and Roy Rucker, all of Kansas City, Mo., for defendants.

Roy K. Dietrich and Frank E. Tyler, both of Kansas City, Mo., for interveners.

COLLET, District Judge.

This cause is pending on motions to dismiss plaintiffs' bill and the intervening petition. These motions assert that this court has no jurisdiction over the subject matter of the action and that plaintiffs and interveners are not entitled upon the facts alleged to the relief sought. These contentions are based upon the theory that the controversy involves a "labor dispute" as defined by the Norris-LaGuardia Act (Sections 101–115, Title 29 U.S.C.A.) and that the conditions precedent to the granting of injunctive relief by this court as set forth in that Act have not been complied with.

It is unnecessary to again review in detail the allegations of the bill and intervening petitions as an analysis of both pleadings and an outline of the cause appear in the reports. Donnelly Garment Co. v. International Ladies' Garment Workers' Union et al., D.C., 20 F.Supp. 767; Id., D.C., 21 F.Supp. 807, 808, 814, 817; International Ladies' Garment Workers' Union, etc., et al. v. Donnelly Garment Company, Donnelly Garment Sales Co., and Donnelly Garment Workers' Union, etc., et al., 58 S.Ct. 875, 82 L.Ed. ——, decided May 16, 1938, by the Supreme Court.

An amended bill has been filed with leave since these opinions were written. The amended bill alleges facts, which, it is asserted, show the existence of all facts necessary to justify injunctive relief by this court in the event it may be determined that the controversy is a "labor dispute" as defined by the Norris-LaGuardia Act, 29 U.S.C.A. § 113(c). Plaintiffs do not

abandon their contention that the Norris-LaGuardia Act is inapplicable and that this action does not involve such a "labor dispute".

■ Defendants questioned the propriety of allowing the filing of the amended bill. Their contention being that the amended bill was a departure, raised new issues and hence should be stricken. I find no merit in this contention. Other questions presented by the amendment will be considered later.

■ A reference to the statement of the case contained in the opinions above cited readily discloses that the present controversy constitutes a "labor dispute" as defined by the Congress in the Norris-LaGuardia Act unless either or both of the following propositions advanced by plaintiffs are correct:

First. It is argued that since the Wagner Act, 29 U.S.C.A. §§ 151–166, requires plaintiffs to negotiate collective bargaining agreements with the representatives of a majority of their employees and with such representatives alone, and since representatives of plaintiffs' employees have been selected by the employees and plaintiffs have made a contract with their employees collectively through those representatives—there can be no 'labor dispute between plaintiffs and these defendants. Certain expressions of this court are cited in support of this theory. Grace Co. v. Williams, 20 F.Supp. 263, and Cupples Co. v. American Federation of Labor, 20 F.Supp. 894. This specific question was not presented or intended to be decided in either of those cases although in the Cupples Case it was referred to in connection with plaintiffs' contention that the pendency of a complaint before the National Labor Relations Board should be considered in determining the existence of a "labor dispute". In the Grace Case the inapplicability of the Norris-LaGuardia Act was urged upon the grounds upheld in Lauf v. Shinner & Co., 7 Cir., 82 F.2d 68, and later rejected by the Supreme Court in Lauf v. Shinner & Co., 58 S.Ct. 578, 82 L. Ed. ——, decided February 28, 1938, and upon the further ground that the Wagner Act superseded and nullified the Norris-La-Guardia Act. Neither was the question definitely decided in National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 90 F.2d 520, or other cases cited.

■■ The only difficulty with plaintiffs' position is that the representatives of plaintiffs' employees were not selected in the manner provided by the Wagner Act. That Act does not confer authority upon this court to determine who the representatives of employees are. It does give that power to the National Labor Relations Board, Sections 159(a), 160(a, b), 29 U.S.C.A., Wagner Act, supra. By Section 158(5) it is declared to be an unfair labor practice to refuse so bargain collectively with the representatives of the employees, subject to the provisions of Section 159(a). Section 159(a) provides that the representatives of the majority shall be the sole collective bargaining agents. Section 160(a) empowers the Board to prevent unfair labor practices and further provides: "This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

■ The present controversy involves the question of whether plaintiffs are engaging in an unfair labor practice by contracting with interveners and refusing to contract with defendants. To determine that question it is necessary to determine the authority of the agents contracting for the employees. If this court could determine the latter question, it could say that certain individuals were the proper representatives of a majority of plaintiffs' employees and thereby determine to that extent the existence or non-existence of an unfair labor practice when that power has been placed exclusively in the Board. If this court had the authority to determine who the proper agents of the employees were and did so and the Board did likewise, reaching a different conclusion, a situation would arise which was evidently not intended to be possible under this Act.

■ Second. Plaintiffs insist this cause does not involve a "labor dispute" because: "There was no controversy here 'concerning terms or conditions of employment' for the additional reason that the International's only claim of alleged grievances concerning terms or conditions of employment in the Donnelly Garment Company plant was based upon knowingly false statements, fraudulently made and intended for the specific purpose of fabricating a fictitious 'labor dispute' in the attempt to bring the Norris-La-Guardia Act into operation as a protective shield for the International's illegal acts."

Plaintiffs' bill discloses that terms and conditions of employment are not alone involved but representation as well is in dispute. A labor dispute exists as to repre-

sentation if it does not exist as to terms or conditions of employment.

A "labor dispute" existing, does the amended bill allege a compliance with the Norris-LaGuardia Act? The most serious questions presented in this regard are (1) whether plaintiff must allege facts showing a reasonable effort to settle the dispute and if so (2) whether such facts appear.

■ In referring to the provisions of Sec. 107, 29 U.S.C.A. supra, the Circuit Court of Appeals for this Circuit (8th) said (Grace Co. v. Williams, 96 F.2d 478, loc. cit. 481):

"But if the finding of these specific facts is essential, then they must be responsive to some allegation in the complaint, and, without such allegation, proof in support of them would clearly be inadmissible.

"The lower court dismissed the complaint for the reason that it did not 'undertake to allege a compliance with the requirements of the Norris-LaGuardia Act, [29 U.S.C.A. § 101 et seq.]' D.C., 20 F.Supp. 263, 270, and not on the ground that the court was impotent to grant injunctional relief against unlawful acts of violence and intimidation by the defendants which federal legislation has not attempted to remove from the power of a court to prevent.

"We are of the view that the plaintiff's complaint was properly dismissed because it did not state facts sufficient to entitle the plaintiff to the relief demanded. The order appealed from is therefore affirmed."

Section 108, 29 U.S.C.A. supra, prohibits injunctive relief unless every reasonable effort has been made to settle the dispute. Hence, an allegation to that effect is necessary.

■ Plaintiffs' bill alleges the receipt of a letter from defendant, International Ladies' Garment Workers' Union, signed by officers of that union, which requested a conference for the purpose of an adjustment of certain alleged grievances referred to in the letter. The bill alleges that the letter was not written in good faith, the grievances referred did not in fact exist but were purely imaginary and not supported by facts, all of which was known to defendants. Plaintiffs did not reply to the letter but ignored it because it is alleged that for many reasons (see note) any settlement between plaintiffs and-defendants of any alleged dispute or demand by defendants was utterly impossible. It is contended that the law will not require the doing of a useless thing and, therefore, any effort to comply with the requirement of Section 108 that every reasonable effort be made to settle the controversy, was unnecessary.

The facts in this case do not justify a departure from the general rule stated in Virginian Ry. Co. v. Federation, 300 U.S. 515, loc. cit. 545, 57 S.Ct. 592, 598, 81 L.Ed. 789.

For the reasons stated the plaintiffs' bill and interveners' petition should be dismissed and the temporary restraining order heretofore issued should be dissolved.

A decree in conformity herewith will be entered and exception then allowed plaintiffs and interveners.

NOTE.—"Plaintiffs further state that defendant International Ladies' Garment Workers' Union, hereinafter referred to as 'Defendant Union', is a national and international organization consisting of over 250,000 members residing chiefly in the city of New York and its environs. That it also has members in the Dominion of Canada and in Puerto Rico and in other foreign countries. That its membership embraces garment workers, textile workers and workers in other industries producing or selling garments of various kinds. That it employs a large number of paid officers, servants and agents who do no productive work but devote their entire time to creating dissatisfaction amongst the employes working in said trades and industries and in intimidating, coercing and compelling those who do not belong to said organization to join the same and submit to its dictation and control, and in seeking to injure and destroy the business of individuals and companies and the business of their customers unless said individuals and companies force their employes to join said organization, all to the end that said organization through its extortions and exaction of dues and tribute levied upon said members, enriches the said officers and agents who are engaged in said activities."

"Plaintiffs further state that defendant Union owns, controls and publishes an official organ styled 'Justice' for the purpose of disseminating information concerning its various activities and carrying forward the conspiracy herein set forth."

"Plaintiffs further state that on the twenty-seventh day of April, 1937, all their employes, voluntarily and without domination or interference of any kind or character whatsoever on the part of the plaintiffs, and in order to protect

themselves against unlawful interference and domination of the defendants and availing themselves of the right to self-organization, to collective bargaining through representatives of their own choosing, and to have said representatives when so selected by a majority of the employes bargain for all the employes in respect to rates of pay, hours of employment, wages, conditions of employment and any and all other matters for their mutual aid or protection as are guaranteed under provisions of 'An Act of Congress of July 5, 1935' (49 Sta. 451–467 [29 U.S.C.A. §§ 151–166]) entitled 'National Labor Relations Act', met and formed a union styled 'Donnelly Garment Workers' Union', and unanimously selected a committee of nine members to represent them for the purpose of collective bargaining, and authorized said representatives to negotiate a contract with said plaintiffs with reference to hours, wages, conditions of employment, bargaining rights, and any and all other matters pertaining to their employment. That said plaintiffs and said 'representatives, after negotiations, entered into a contract on the 27th day of May, 1937, with reference to hours, conditions of employment, bargaining rights, arbitration and membership of said employes in said union. That said parties, after further negotiations, entered into a supplementary contract on the 22nd day of June, 1937, providing for a fixed scale of wages. That said contracts provide for more favorable wages, working conditions and privileges for employes than are contained in any contract entered into by the defendant International Ladies' Garment Workers' Union or any suborganization or association thereof with any other person, firm or corporation engaged in the garment business. That said contracts are being fully complied with by plaintiffs and their employes. That said employes are perfectly satisfied with the terms and conditions of the same and refuse and have refused to join defendant Union or to be represented by it or any of its officers or agents."

"That on and prior to the making of said contracts and each of them, and at the time of the filing of this suit, all of the employes of plaintiffs were, and they are now, members of the Donnelly Garment Workers' Union; and none of plaintiffs' employes were at any of said times, and none of said employes are now, members of the defendant Union."

"Plaintiffs further state that the defendants, together with their agents, servants, employes, and other parties now unknown to these plaintiffs who are acting in confederation with defendants and at their instigation, have engaged in and are now engaged in an attempt to disrupt said Donnelly Garment Workers' Union and to cause it and its members to break their said contract with the plaintiff companies by various devices, means and misrepresentations and particularly by the means hereinafter set forth, all of which is done in pursuance of an illegal and unlawful combination and conspiracy; that among other things, they have sought and are seeking to force said employes to join defendant Union and to compel the plaintiffs to force them to join said defendant Union, all in violation of 'An Act of Congress of July 5, 1935' (29 U.S.Code, Secs. 151–166, 29 U.S.C.A. §§ 151–166), known as the 'National Labor Relations Act'."

"Plaintiffs further state that for many years defendants together with said other persons united with them have been and are now engaged in a general combination and conspiracy to force, against their will, all persons, firms or corporations engaged in the manufacture and sale of ladies' garments in interstate commerce in the United States and foreign countries, including plaintiffs herein, to organize their employes into an organization to be part and parcel of the defendant Union, with the intent thereby to control the employment of labor in and the operation of all said businesses, and to extort from said workers large sums of money by way of dues, fines, penalties and other exactions, and, in order to carry out such conspiracy and scheme, to restrain and to destroy the interstate trade and commerce of such persons, firms or corporations, their employes and customers in the several states until such time as, from the damage and loss of business resulting therefrom, the said persons, firms or corporations will yield to defendants' said demand and force their employes to join the defendant Union and to subject themselves and their employes to the orders, dominance and control of defendant Union and its officers, to such an extent that the right of the employers to deal with their employes as to wages or conditions of labor is denied, and the right of the employe to bargain for and fix his own wages is denied, and said employes are compelled, although satisfied with their wages and working conditions, at the mere command of the said Dubinsky or at the command of certain of his subordinates, to strike, and to lose the opportunity to earn a livelihood, and to enrich defendant Union and its officers by the payment of large sums of money as dues, fines and assessments, and to submit to defendants' each and every command so completely as to reduce themselves to a species of slavery."

"That in furtherance of said scheme and conspiracy and in carrying the same into effect, the defendants have organized gangs of lawless and dangerous persons, not employes of the particular plant to be assaulted, and have caused said gangs to attack the employes of various plants who desire to work and to threaten them with great bodily harm and even death if they continued to work and refused to join defendant Union and assist it in a strike against their employers. That among other means employed, said gangs have assaulted the employes, most of whom were women, with fists, knives, razor blades, clubs, pulling of hair, that one of their favorite devices was and is to tear the clothing from the women employes and to strip them naked in the public streets, and to threaten all manner of physical harm to them and their families and to use toward them abusive, vile and obscene language, and to assault and molest them on their way to and from their work, and to prevent by threats of violence to drivers of delivery vehicles merchandise from being taken away from the places of business or delivered into the same, and by picketing in such large numbers about the places of business as to prevent ingress and egress from the same."

"That in furtherance of said scheme and conspiracy and in carrying the same into effect defendants published and circulated false and libelous attacks about said companies, including the statement that orders could not be filled unless said companies yielded to the demands of defendant Union."

"That all of the aforesaid acts were, within the last three months, done and perpetrated in Kansas City, Missouri, against and upon the Gernes Garment Company, Inc., the Missouri Garment Company, and the Gordon Brothers Manufacturing Company and their employes."

"That thereupon said companies obtained writs of injunction in the Circuit Court of Jackson County, Missouri, against defendant Union and its members commanding them to desist from all of said acts. That defendant Union, its officers, employes and members, engaged in said unlawful activities, openly defied said injunctive judgments and writs, and boasted that they would not obey the injunction of any court, and continued their depredations aforesaid until in the end the said companies were compelled to submit to the demands of defendant Union and to coerce or compel their employes to join the same or to quit their employment."

"That in all of the matters aforesaid, the defendants Meyer Perlstein and Wave Tobin, being then in the city of Kansas City in this District, organized said gangs and directed and controlled them in the perpetration of the atrocities aforesaid."

"That in the city of St. Louis, the methods aforesaid were employed against a number of manufacturing companies and their employes. That the outrages were under the special direction of defendant David Dubinsky. Among other atrocities there perpetrated, numerous women employes were stripped naked in the streets, vilified and threatened and brutally beaten. That as a result of these outrages and wrongs in the city of St. Louis, at least one large factory was compelled to close its doors and more than 2,000 workers, chiefly women, were deprived of employment."

"That in carrying out the conspiracy aforesaid, the said defendants have in numerous cities of the United States employed the devices and committed the wrongs above described."

"Plaintiffs further state that defendants, in pursuance of their illegal and unlawful combination and in order to increase the effectiveness of their acts against plaintiffs, their employes and customers, have made public announcement of the fact that they will use against plaintiffs, their employes and customers the same means to accomplish their aforesaid purpose as they have used against other persons, firms and corporations, including Gernes Garment Company, Inc., Missouri Garment Company, Gordon Brothers Manufacturing Company, as hereinbefore alleged, unless plaintiffs will immediately yield to defendants' demands and force their employes to join defendant union and shall subject said employes to its dominance, control and extortions."

"That as a part of said conspiracy and in furtherance of its objects and designs and especially in furtherance of their boycotts against the products of companies who have refused to force their employes to join defendant Union, and in furtherance of their scheme to boycott all places of business buying and selling the goods produced by the company attacked, defendant Union has established an official paper or organ styled 'Justice' in which are published articles, reports and statements of union officers, their agents, members, servants and employes and other persons, containing false and libelous statements concerning the manufacturers of garments and their method of manufacture, the character of their goods, the treatment of their employes, their inability to fill orders, and other false and scandalous statements. That the said paper 'Justice' is widely and generally distributed to and among

1004

the members of said defendant Union and other affiliate unions and widely distributed elsewhere. That the officers and servants of said defendant Union give frequent interviews to the press of the country making false statements regarding the producers of garments and regarding all of the other matters heretofore set forth, in order to injure the business of said producers and their customers and to restrain the commerce in said goods among the several states. That all of the aforesaid measures of boycott have been brought and are being brought against these plaintiffs in violation of the laws of the United States and of the State of Missouri."

"Plaintiffs further state that in the year 1934 the defendant Union, by and through its officers, agents and servants including defendants David Dubinsky, Meyer Perlstein and Wave Tobin, in furtherance of said conspiracy, undertook to create dissension amongst the employes of plaintiff Donnelly Garment Company and to create a spirit of antagonism amongst said employes against said plaintiff Donnelly Garment Company, by making false statements and charges against said plaintiff and by causing certain persons who were no longer in the employ of plaintiff Donnelly Garment Company to organize or pretend to organize a branch of said defendant Union for employes of Donnelly Garment Company, and to cause to be filed false charges against said plaintiff Donnelly Garment Company. That amongst the false reports and statements made by the said defendant Union and by the said Perlstein and his agents and assistants were the charges that the wages paid to the employes of Donnelly Garment Company were much less than those paid in other shops in every city of the country where dresses were produced; that the employes of the Donnelly Garment Company were receiving wages fifty per cent or less than were paid in said other factories; that the workers for the Donnelly Garment Company were being exploited by the Company, all of which statements were maliciously made and were known to the makers thereof to be false and untrue. That in furtherance of said conspiracy, said false statements were printed in circulars and distributed, among other places, at the doors of the Donnelly Garment Company plant, to its employes and to customers. That said conspirators further caused said Donnelly Garment Company plant to be picketed and said pickets carried placards charging that the said company was unfair to its labor. That its customers were called upon to no longer buy the products of said Company. That by the means aforesaid and by the circulation of other false and slanderous and libelous statements, defendant Union and its said officers and agents sought to induce or compel the employes of said Donnelly Garment Company to join defendant Union and to strike, and to the ends aforesaid held meetings in Kansas City, Missouri, at which it invited the employes of said Donnelly Garment Company to attend, at which said meetings the false charges heretofore set forth were made."

"That afterwards, in the year 1935, in furtherance of said conspiracy defendant Union and its agents, servants and employes including defendant Meyer Perlstein called a mass meeting at Kansas City, Missouri, and sought to induce the employes of the Donnelly Garment Company to be present, and at said mass meeting falsely charged that the plant of said Company was a sweat shop plant; that starvation wages and sweat shop hours were about to be reintroduced in Kansas City by all garment makers of said city, including the Donnelly Garment Company, and caused circulars containing said charges to be distributed at the doors of the Donnelly Garment Company factory, to its employes, and to customers."

"That in carrying forward said scheme, plan and conspiracy to compel plaintiffs to force their employees to join defendant Union as herein alleged, defendant Meyer Perlstein, as Regional Director of defendant Union, on or about February 25, 1937, caused to be published in metropolitan newspapers of Kansas City, Missouri, having circulations of many hundred thousand, a public statement wherein he announced that the defendant Union planned a campaign to organize the workers in the Donnelly Garment Company plant, and had appropriated a large sum to be spent in the drive; that the defendant Union had employed six women whom defendants planned to send to various cities and towns where the garments of the Donnelly Garment Company were sold, advising retailers and labor organizations of the campaign; that within a year the defendant Union would have the employees of the Donnelly Garment Company completely organized, and that as soon as the defendant Union had enough members, said Union would call a strike; that the calling of the strike would be only one part of the plan; that a further part of the plan contemplated the sending out over the trade territory of the Donnelly Garment Company the six women representatives aforesaid who would visit all cities and towns where the Donnelly Garment Company's garments were sold,

and would contact all customers of the Donnelly Garment Company and all labor organizations in said cities and towns, in the effort to interest them in the drive to unionize the Donnelly Garment Company; that the first step in the attempted consummation of this plan would be for the defendant Union to send a letter to the plaintiff Donnelly Garment Company suggesting a conference to establish collective bargaining on questions of wages and working hours; and that if the Donnelly Garment Company refused to enter into a conference, the defendant Union would actively begin its said campaign and drive."

"That in carrying forward said scheme, plan and conspiracy to compel plaintiffs to force their employes to join defendant Union as herein alleged, defendant David Dubinsky, president of defendant Union, on March 5, 1937, held a public meeting at Kansas City, Missouri, at which in substance and effect he declared that defendants intended to force the Donnelly Garment Company to unionize its workers, and that an intensive campaign to that end would be started within a few days; that the first step would be a polite letter to the plaintiff Donnelly Garment Company inviting it to confer with the leaders of defendant Union about signing a union contract (meaning a contract which would compel said Company to force its employes to join defendant Union), and that if said Company refused to accede to the demands of the said leaders, a campaign to force said company to yield would at once be begun; that while it might take a long time to force said Company to submit and cause the unionization of its employes and yield to defendants' demands, they (meaning said conspirators) would win out in the end, as all of the 240,000 members of the Union were behind them (meaning the said conspirators). That thereafter, in accordance with the aforesaid public announcements, defendants on March 9, 1937, wrote and caused to be delivered to the plaintiff Donnelly Garment Company a letter reading as follows:

"'March 9, 1937.
"'Donnelly Garment Company,
"'1828 Walnut Street,
"'Kansas City, Missouri.
"'Gentlemen:
"'The Kansas City members of the International Ladies' Garment Workers' Union feel compelled to place before you the following grievances that should be adjusted immediately.

"'Fifteen members of our Union were discharged by your firm because of their affiliations with our organization. Their case was up before the National Labor Relations Board. During the period the hearings took place the NRA was declared unconstitutional by the Supreme Court of the United States and the Government could proceed no further. The discharged workers have not as yet been returned to work by your firm.

"'The Dress Industry, in which your firm is engaged, is highly unionized throughout the country. Every producer of dresses is in contractual relations with our Union. The 150,000 workers employed in this industry are enjoying a 5-day, 35-hour working week and a $22.05 per week minimum wage scale for operators and reasonable, fair minimum scales for finishers, pressers, cutters, et cetera. Piece workers, who compose the majority of workers in your shop as well as in the industry, are enjoying the right, through committees selected by them, of having an equal voice with the management in each shop in determining the piece rates for each garment or operation of a garment.

"'The workers in the industry enjoy the freedom and right of organization. Collective bargaining has been established as a permanent institution. These are the conditions and wage scales in the industry.

"'In your shop the minimum wage scale for operators is between $12.50 and $15.00 per week.

"'The wage scales for finishers, pressers and cutters are at least 30% lower than those that exist in the industry.

"'The hours of work in your shop are 40 and more per week.

"'Your workers are denied the right of joining a labor organization, and those who do, are immediately discharged. Your workers are denied the privileges of genuine collective bargaining. The piece workers in your shop have no voice as to what the piece rates should be as they are set exclusively by representatives of your firm.

"'The conditions and wages under which your employees are working not only deprives them of the privileges and opportunities enjoyed by the workers in this industry, but endangers their general work standards and wage scales. Your firm has undue and unjustified advantages over your competitors. The Union believes in 'Fair Competition', but it does not consider competition fair when it is gained solely at the expense of the workers.

"'Under your system of production the worker is compelled to invest extraordinary effort, but the reward that follows is very meager in proportion to the efforts invested. Under modern methods of production such treatment of workers is not only wrong from the

humane point of view, but also destructive from the economical point of view. In comparison with other shops in the industry which produce the same type of garment the production in your shop is about 30% higher while the earnings of the workers are about 30% lower.

" 'We, therefore, believe that a conference between our Union and your firm, for an adjustment of these grievances, should take place immediately. The Union has named a committee which stands ready to meet a similar committee named by your firm.

" 'May we respectfully request that you advise us before the end of this week as to when and where it would be convenient for you to meet our Conference Committee.

" 'Our aim is industrial peace. We believe in intelligent co-operation between employer and employee. Such co-operation is essential for the welfare of all factors in industry, including the consuming public and community at large. Peace and harmony prevails in the major part of the Dress Industry and we are eager to extend this co-operation to include your firm. Let us join hands to avoid industrial conflict.

"Respectfully yours,

" 'Kansas City Joint Board
" 'International Ladies' Garment Workers' Union
" '[Signed] Wave Tobin
" 'By Ware Tobin, Manager.
" '[Signed] Meyer Perlstein
" 'Approved by: Meyer Perlstein, Regional Director International Ladies' Garment
" 'MP Workers' Union.' "

"That plaintiffs never replied to said letter and ignored the same; and so defendants wholly failed in their intended purpose to provoke a controversy with plaintiffs by the writing and transmittal of said letter."

"That each and all of the statements in said letter relating to alleged 'grievances' were false, and defendants well knew they were false when the letter was written; and defendants made said false statements and communicated the same to plaintiff Donnelly Garment Company in said letter with the fraudulent intent and purpose of attempting to make it ostensibly appear that there was a 'labor dispute' within the meaning of the Norris-LaGuardia Act (29 U.S.Code, Secs. 101–115, 29 U.S.C.A. §§ 101–115), when in fact there was none, thereby fraudulently attempting to deprive courts of justice, including this court, of the power and jurisdiction to enjoin the wrongful acts described in this bill, all of which wrongful acts at the very time they wrote and transmitted the aforesaid letter defendants planned to commit. That said letter was written by defendants with the further fraudulent and malicious purpose to destroy plaintiffs' business by publishing and widely circulating said letter (and defendants in fact did immediately publish and widely circulate said letter) with its false, libelous and defamatory statements, to the public and plaintiffs' customers; all for the purpose, by the fraudulent means herein alleged, to coerce and compel plaintiffs to force their employes to join the defendant Union. That the aforesaid letter was therefore not written in good faith but was written in bad faith, and solely with the fraudulent, ulterior purposes aforesaid. That said letter, therefore, was and is a mere sham, subterfuge and pretense; and that each of the so-called 'grievances' enumerated therein had no foundation whatsoever in fact, as defendants well knew when the letter was written."

"Plaintiffs state that at the time the said Dukinsky and Perlstein made the statements aforesaid, and when said letter was written, there was peace, harmony and good will existing between the employes of the plaintiffs and said plaintiffs; and that, as plaintiffs are informed and believe, not a single one of their employes belonged to defendant Union or any of its branches; and, therefore, the defendant Dubinsky, defendant Perlstein and the said defendant Union did not represent and had no right to represent any of the employes of plaintiffs."

"Plaintiffs further state that for the purpose of carrying out said conspiracy, defendants opened headquarters in Kansas City, Missouri, which were in direct charge of defendants Meyer Perlstein and Wave Tobin, and sought to compel plaintiffs to force their employes to join defendant Union and to subject themselves to the orders and commands of said Union and its officers, and defendants organized and began to carry forward a campaign to boycott the products handled by plaintiffs, and to boycott the customers of plaintiffs who were handling their goods in the various retail stores in the several states of the United States."

"That as part of said scheme of boycott defendants threaten the owners of said stores that their places would be picketed, that they would be held out as unfair to labor, and their customers would be warned not to purchase goods of any kind at their said stores including the products of plaintiffs."

"That for the purpose of carrying forward said boycott and making it effective defendants, through the columns of the

aforesaid publication 'Justice', which is published and widely circulated amongst all of the members of defendant Union and elsewhere, have maliciously and falsely charged, among other things, that plaintiffs have established in their plant the most perfect driving system developed by the ingenuity of man, that the girl workers are so driven that their energies become quickly exhausted; that the minimum wage scale in plaintiff's plant is $15.00 per week while the minimum scale for the same type of dresses in other concerns in this section is $22.-05 per week; that the hours said employes of plaintiffs are compelled to work were until recently 50 hours per week; that no worker showing any inclination toward unionism is permitted in the shop and that the campaign to unionize plaintiffs' companies would be two-fold 'First, an organization among the workers and, second a publicity campaign on a large scale' that would call the attention of retailers and customers to the aforesaid alleged conditions."

"That said defendant Perlstein reported to defendant Union, and said report was published in said 'Justice' of date April 1, 1937, in substance and effect that the employes of plaintiffs work over 58 hours per week; that the speed-up system in plaintiffs' plant is such that very few girls can last long; that their nerves become shattered in no time; that they have in said shop a caste system, that the higher grade of employes cannot mix with the lower grade, and when they are seen socially together both are fired, all of which statements were made maliciously and were false and untrue."

"That in said 'Justice' of June 15, 1937, is published the declaration that the drive to unionize the Donnelly Garment Company continues to be the sensation of the day, and promises to become more dramatic as the drive continues; that many outside elements have entered the field such as detective agencies, some of them the most notorious in the country; that said statements were false and maliciously made."

"That the statement was further made in 'Justice' that the campaign of defendant Union was three-fold, first, to unionize the workers in the plant; second, the wide publicity campaign (meaning the campaign of slanderous and false statements heretofore set out) and, third, personal contact with retailers that sell and with the public that buys the Nelly Don dresses (meaning a secondary boycott). That it was stated in said publication of June 15th that two groups of girls left on the road to visit every town of more than 10,000 where the Nelly Don dresses are being sold. That the first group had left the preceding Saturday. That a young lady by the name of Jane Palmer who was formerly a practicing attorney in Kansas City and had, for the last six months, been connected with defendant Union was in charge, accompanied by Esther Smith, a member of Local 118 in Kansas City, who on the picket line had developed an intelligent initiative and knowledge, and was to be entrusted with this important work. That said two will visit the Middle West and Eastern Section of the country. That another group, headed by Miss Mary Jane Miller, manager of Local 114, Houston, Texas, accompanied by Grace Bullard, a member who recently joined defendant Union ranks in Kansas City and had the privilege of being a delegate to the Union convention, will visit the South. That labor organizations, women's study and social clubs will also be visited and appealed to for a boycott of Nelly Don dresses and all places of business that sell the same."

"Plaintiffs state that all of the aforesaid plans and threats were immediately carried into execution. That the agents above referred to have been engaged in carrying on said boycott by visiting a large number of dealers in the various states of the Union, who are the customers of and who sell the products of plaintiffs. That at various cities and towns, including Alexandria, La., Remsen, Iowa, Jackson, Miss., Birmingham, Alabama, Decatur, Ill., Independence, Kansas, Baton Rouge, La., Mobile, Ala., Gulfport, Miss., Parsons, Kansas, Des Moines, Iowa, Beaumont, Texas, Madisonville, Ky., New Orleans, La., said agents and employes of defendant Union have gone to the proprietors or managers of said places of business, and have insisted that they shall not handle or sell garments manufactured by plaintiffs for the reasons above set forth, and for the further reason that plaintiffs will not be able to fill orders on account of the attacks of defendant Union; and have threatened them with declaring a boycott against their places of business and picketing the same, and have circulated among said customers and the public all of the false and slanderous statements heretofore set out; and that the agents aforesaid and, as plaintiffs are informed and believe, many other agents operating in the different cities and states of the Union whose names at this time plaintiffs cannot set forth, are engaged in carrying forward said boycotts in the manner and by the means heretofore stated."

"Plaintiffs further state that said defendants have threatened, in support of said boycotts, to carry on an advertising

campaign in the press of the United States and by means of radio, to prevent the patronage of products of plaintiffs; and the said defendant Meyer Perlstein representing said defendant Union has declared through the public press that if store operators refused to comply with defendants' demands by ceasing to handle products of plaintiffs that their stores will be picketed; that a strike will be called in plaintiffs' plant; and that defendant Union is ready to spend $250,000 to accomplish its goal, and that that amount of money is ready. That said defendant Union also caused to be published a statement that there were two organizers working in the plant at the present time and that Miss Wave Tobin (defendant herein) reported that she would build up the membership in the defendant Union in the plaintiffs' plant, and that a strike in the plant would be necessary."